**Gedeon WALES, et al., Plaintiffs,**

v.

**JACK M. BERRY, INC., et al., Defendants.**

**No. 2:95–CV–66–FtM–23(B).**

United States District Court, M.D. Florida, Tampa Division.

Nov. 30, 2000.

---

A. Neal Barkus, Jeffrey B. Hardie, Hunton & Williams, Washington, DC, D. Alan Rudlin, Hunton & Williams, Richmond, VA, Thomas M. Mackall, Hunton & Williams, Washington, DC, Cathy L. Lucrezi, Law Office of Cathy L. Lucrezi, Ft. Meyers, FL, for Plaintiffs.

G. ParisSykes, Jr., David P. Phippen, Kilpatrick Stockton, L.L.P., Atlanta, GA, James Lawrence Nulan, Henderson, Franklin, Starnes & Holt, P.A., Ft. Meyers, FL, for Defendants.

## ORDER

WILSON, United States Magistrate Judge.

Previously in this case, Findings of Fact and Conclusions of Law were entered holding that the defendants had committed certain violations of the Migrant and Seasonal Agricultural Worker Protection Act ("AWPA"), 29 U.S.C. 1801–1872, and the Fair Labor Standards Act ("FLSA"), 29 U.S.C. 201–219. Subsequently, a second phase of the non-jury trial was conducted in an effort to determine what relief was warranted as a result of those violations. Based upon the evidence and the law, I find that damages should be determined in accordance with the principles set out in this Order. In essence, the plaintiffs are entitled to damages for the FLSA violations in the amount of $20,958.54; actual damages of unpaid wages with prejudgment interest for one AWPA violation in the amount of $690,557.00 plus additional prejudgment interest; and statutory damages for other AWPA violations in the amount of $20.00 per plaintiff per season, which would mean that statutory damages could range from about $68,000.00 to about $204,000.00. Injunctive relief is warranted only insofar as the defendants will be directed to comply with requirements of the Social Security Act for the additional wage payments.

### I.

A. At the outset, the rhetoric in the plaintiffs' memoranda requires a restatement of some of the basic findings from phase one of the trial. I did not find on the part of defendants' management "a deliberate scheme to alter time records," or "exploitive practices," or that they "implemented a bin-to-hour matching scheme

and other dubious methods," or that there were "other methods the Defendants exercised to defraud the farmworkers" (Doc. 332, pp. 2, 48; Doc. 324, p. 30 n. 16). While that is what the plaintiffs sought to prove, they failed to do so.

In Period I (November 1991 through December 1992), office workers deliberately reduced hours, but that was the result of a misunderstanding and not due to directions from defendants' management. Further, during that period, there was matching by the crew leaders of bins to hours 21.9% of the time. There was no probative evidence, however, that management told the crew leaders to do that.

Similarly, in Period III (mid-December 1993 through June 1994), there was matching of hours to bins 22.4% of the time. It was found that this was not the result of directions from management. However, the circumstances indicated that management knew that matching was occurring.

Thus, the underreporting of hours during those two periods was not caused by a specific intent to cheat the workers or violate the law. Rather, the statutory violations arise from the low standard of liability set by the FLSA and the AWPA.

The absence of a malevolent intent is confirmed by Period II (January 1, 1993, through mid-December 1993). There was no probative evidence that during Period II there was a real, or perceived, policy of the defendants that directed, or even suggested, underreporting hours, or matching hours to bins. In fact, while the defendants failed to persuade me that there was an overreporting of hours during Period II, they clearly produced better evidence of overreporting during that period than the plaintiffs did of underreporting. Accordingly, it was problematic whether there were intentional violations of the AWPA regarding unpaid wages during Period II. The most I was prepared to say about that matter following the phase one trial was that, "[u]nder the civil standard that a party is responsible for the natural consequences of its acts, it would seem that the mere failure to pay the minimum wages that were due would constitute an intentional violation" (Doc. 262, p. 39).

In short, the evidence did not establish a "deliberate scheme to alter time records" on the part of defendants' management even in Periods I and III. Moreover, the evidence concerning Period II, which possibly involved overreporting, contradicts the idea of such a scheme.

For the most part, the inaccuracy of the records and the underreporting of hours was due to the casual and careless recordkeeping by the crew leaders, unprompted by any directions from management. Importantly, the plaintiffs in their memoranda following phase one did not attempt to predicate statutory violations on the conduct of the crew leaders, as noted previously (Doc. 262, p. 38 n. 9). Rather, they directed their attack, unsuccessfully, at the defendants' management, possibly in the belief that that would generate greater statutory damages. It is too late now at the damage stage for the plaintiffs to change their approach and to base their claims upon the actions of the crew leaders.[1] Nevertheless, the issue of whether the crew leaders were the defendants' agents does not make a difference in my assessment of actual damages of unpaid wages; under the facts of this case and in light of the manner in which the damage evidence was presented, the plaintiffs are entitled to recover the reasonable estimate

1. There is no basis for concluding in the absence of a meaningful argument that the crew leaders were the agents of the defendants, at least in Period II where there appears to be some overreporting of hours.

of their unpaid wages for the entire three-year period.

B. The second phase of the trial centered around the determination of unpaid wages due to FLSA plaintiffs and the AWPA class members. The evidence regarding that issue, with few exceptions, was presented in a general way without any attention to the details of individual pickers' circumstances. Rather, the parties have submitted a number of schedules of damages that attempt to cover the varying alternatives that could be found in this case. At bottom, those schedules are predicated, to a substantial extent, upon an estimate of the hours worked, and, to a lesser extent, upon an estimate of the days worked. Consequently, the broad-brush approach prevents any fine calculation with respect to a particular person's damages and that approach means that all that can be obtained is a reasonable estimate of unpaid wages.

Moreover, although the parties at the first phase broke the three-year timeframe of this suit into three distinct segments, their damage assessments typically treat the entire period as a whole. The parties' approach in this respect is reasonable since there appears to be no requirement that the plaintiffs demonstrate violations in each of the three (somewhat artificial) periods, as opposed to simply showing that violations occurred at some point during the entire period covered by the lawsuit. In any event, because the schedules do not generally differentiate between the periods, they do not always correspond with the findings made after phase one of the trial.

It is recognized that one alternative to proceeding without precise schedules is to direct the parties to prepare additional schedules taking into account further refinements set out in this Order. That approach seems unwarranted for several reasons. In the first place, neither side has asked for such an opportunity. The parties, moreover, have already had two trials at which they could seek to support their various positions. Furthermore, this case has been pending for over five and one-half years and any compensation to which the plaintiffs are entitled is long overdue. In addition, the amount of damages that will be awarded will, in all events, be an estimate, so that there is no reason to think that more precise calculations could produce the "correct" answer. Accordingly, at this point, I will select from the various damage schedules the ones that provide the best estimate of actual damages, provided that they do not appear to understate the unpaid wages.

C. In my view, the most accurate calculations were submitted by defense witness Amit Mehta. The plaintiffs challenge Mehta's expertise and contend that the schedules prepared by their expert, Kenneth J. Barker, are superior. For the following reasons, I accept Mehta's submissions over Barker's.

Initially, it is noted that for some reason that escapes me the defendants did not formally proffer Mehta as an expert witness. Possibly this is because the bulk of Mehta's evidence was simply based upon an examination of records and mathematical calculations grounded upon that examination. But, as plaintiffs' counsel noted at trial, Mehta did exercise some judgment in deciding how to proceed.

To the extent Mehta exercised judgment, I find that he was clearly qualified to do so. He has a bachelor's degree in computer science, an MBA from the University of Maryland, and several years experience doing litigation consulting and business valuation work. Moreover, I was particularly impressed with Mehta's personal familiarity with the records that were involved. Significantly, following the first phase of the trial, I found well-considered Mehta's methodology for estimating

in certain instances the number of days worked and I adopted his judgment on that point. His presentation at the second phase only confirms my confidence in his judgment—to the limited extent he even exercised any judgment.

The plaintiffs complain in particular about Mehta's treatment of a database known as NPK785L1. There was testimony at the first phase of the trial that NPK785L1 contained records of grove workers and other employees who are not included in this lawsuit. Mehta testified at the second phase that he compared a printout of the NPK785L1 database to the time records to find those items showing boxes picked. He found that for the period of December 7, 1992, to December 27, 1992, picking records were placed, apparently accidentally, in NPK785L1. Mehta then included the picking records for those days with the other picking databases. He excluded the remainder of NPK785L1 because, in his view, they were non-picking records.

On the other hand, Barker included the entire NPK785L1 database in his computation. His reasons for doing so were that 97% of the individuals in the database were also in the two picking databases, and also that, in order to determine damages on a workweek basis, it is necessary to take into account all hours worked and amounts received during a workweek (Doc. 315, p. 72). These reasons are unpersuasive.

In the first place, the inclusion in the NPK785L1 database of workers who are also found in a picking database does not mean that the work recorded in NPK785L1 must have involved picking. Thus, it could indicate no more than that the individuals listed in both NPK785L1 and a picking database performed non-picking tasks sometimes, and picking work other times. Accordingly, a closer examination is necessary before it can be concluded that NPK785L1 consists entirely of picking records. Mehta performed such an examination, and Barker apparently did not.

Furthermore, Barker is mistaken in saying that in order to determine whether there was a minimum wage violation, all work performed in that workweek must be considered. As the defendants correctly point out, there is no allegation, or evidence, in this case that workers performing non-picking work, such as grove care, were not paid the minimum wage or that their hours were underreported. Consequently, a minimum wage violation in any workweek arising from citrus picking can be determined without consideration of the non-picking work and pay. This is because it is proper to assume, in the absence of any assertion or indication to the contrary, that all non-picking work was compensated at the minimum wage, so that that work would have no effect in establishing a minimum wage violation.

On the other hand, Barker's inclusion of the non-picking work reflected in the NPK785L1 database would erroneously inflate the amount of unpaid wages that are due. This is due to the fact that, under the prior Order, each worker is to be credited with nine hours for each day he or she worked.[2] Consequently, if the non-

---

**2.** The defendants initially understood the "average" workday of nine hours to mean merely that over the three seasons, or over a particular workweek, a picker had to average nine hours per day in order for the defendants to avoid any increase in hours (Doc. 275, pp. 5–6). That is not what was contemplated by the Findings of Fact and Conclusions of Law. The first phase of the trial sought to establish the typical workday of a picker, not the average workweek, and certainly not the average for three seasons. Thus, in my mind, the word "average" was being used in the sense of "typical, common, ordinary." Webster's Third New International Dictionary (Unabridged 1993 ed.), p. 150; *see, e.g.,* Doc. 262,

picking work in the NPK785L1 database is included, any worker performing grove care or plant work for less than nine hours on a given day would have their hours increased to nine, even though the person has been paid the minimum wage and there could be no minimum wage violation. Under Barker's approach, all non-picking workers working less than nine hours on any day (and there is no reason to think that the number of such workers would be negligible) would receive compensation in this lawsuit to which they are clearly not entitled.

In sum, Mehta's judgment, based upon his examination of the underlying time records, to exclude all of NPK785L1 except for data between December 7, 1992, and December 27, 1992, is supported by the evidence and is clearly reasonable. Barker's treatment of NPK785L1, in contrast, is plainly flawed and not adequately explained. I therefore accept Mehta's approach to NPK785L1.

Mehta and Barker also have a basic disagreement with respect to the application of the nine-hour minimum. Again, I agree with Mehta's treatment of that matter.

Following the first phase of the trial, I adopted Mehta's methodology in estimating the number of days worked in those instances (which turned out to be 1 %–2 % of the records) where the time logs appeared to contain hours for more than one day. Mehta's approach was to consider all recorded hours up to thirteen as one day, and thereafter add one day at each multiple of seven. For example, fourteen hours

would indicate two days of work, as would eighteen hours, while twenty-one (to twenty-seven) hours would translate to three days of work.

In preparing his schedules, Mehta determined the number of days worked by this method. He then determined the number of hours worked per day under the direction that each picker be credited with no less than nine hours each day (what Mehta called the "floor nine" method). Under this approach, for example, a picker who is listed as having worked fifteen hours would be considered to have worked two days, with nine of the fifteen hours being assigned to the first day and three hours being added to the remaining six recorded hours for a second day's total of nine hours.

Barker did it differently. In the example given, Barker would credit thirteen of the fifteen hours to the first day, and then add seven hours to the remaining two hours for a total of nine hours on the second day. That is not what I had in mind in adopting previously Mehta's approach to estimating days. Barker has taken the method that was intended only for estimating days and has misused it as a device to increase the number of estimated hours above the minimum of nine.

In their post-trial memorandum, the plaintiffs have proposed a method for estimating a correction for this error. I find that proposal unacceptable. In the first place, the proposal does not correct Barker's mishandling of the NPK785L1 database. Furthermore, the plaintiffs' proposed method is somewhat complicated

---

p. 23, ¶ 81 ("the average or typical work day"). The evidence certainly did not indicate, for example, that if a picker worked thirteen hours one day, he or she would take off four hours either that week or at some other time, using something in the nature of agricultural "comp time." To the contrary, the evidence demonstrated that "the pickers worked a full day" (Doc. 262, p. 21, ¶ 77). In

light of the defendants' misunderstanding, an Order was entered clarifying "that the figure of nine (9) hours per day is the minimum number of hours to be credited to each picker for any day he or she worked, unless the defendants come forward with specific evidence showing that on a particular date the picker was absent for a period of time" (Doc. 281, p. 2).

and I see no justification for using it, since Mehta has submitted schedules that have been prepared correctly.

The defendants also point out that Barker mistook the records of Angel T. (Tomas) Lopez for an FLSA plaintiff named Trinidad Lopez. The plaintiffs, on the other hand, failed to show any comparable errors by Mehta. While Barker's mistake in this respect is hardly a determinative factor, it certainly undercuts the plaintiffs' contention that Mehta, who apparently was error-free, is somehow an unqualified witness.

More significant in discounting Barker's opinions is what appears to be a bias in favor of maximizing the plaintiffs' recovery. His choices of including all of the NPK785L1 database and using thirteen hours in the multiple-day situation are contrary to an objective, reasoned approach. Mehta, on the other hand, gave me the impression that he was objectively providing pertinent data in alternative schedules that he was asked to prepare. In fact, Mehta discovered some picking records in NPK785L1 and, contrary to the defendants' interest, included them in his calculation.

For these reasons, I accept Mehta's presentation over Barker's. Accordingly, it is to Mehta's schedules that I will look for the appropriate estimate of unpaid wages.

## II.

Although the AWPA claims were set out in Count I and they clearly present the most significant issues in this case, the parties have each addressed the FLSA claims first. Consequently, I will do the same.

A. The FLSA claims raise issues concerning the statute of limitations. The Portal–to–Portal Act provides for a two-year limitation period for minimum wage claims, except that there is a three-year period for willful violations. 29 U.S.C. 255(a). Based upon the evidence and the subsequent memoranda, I concluded in phase one that the changes by office personnel in Period I and the matching in Period III were willful violations having a three-year limitation.

Contrary to the plaintiffs' suggestion, I did not leave open the willfulness of other violations. Rather, I found that "[t]he plaintiffs ... have not proven any other willful violations" and that, if there were other FLSA violations, they were governed by the two-year limitation period (Doc. 262, p. 44).

No invitation was extended to revisit that conclusion. Nevertheless, it is appropriate to add that the evidence showed sufficiently that in Period III the defendants knew of the matching, while the evidence regarding Period I did not.

The problem now presented is that the defendants' schedules do not correspond with the limited finding of willful violations in Periods I and III. The defendants made no apparent attempt to identify instances of matching in Period III that would restrict the application of the three-year limitation to those violations. Rather, they simply submitted schedules which extended the three-year limitation to all of Period III.

The defendants seemingly did seek to limit the application of the three-year limitation to violations in Period I caused by the office practices. In this respect, the defendants presented a schedule listing three workers as those affected by office changes (Defs.Ex. 217). However, this was nothing more than an iteration of the allegedly affected individuals for whom a deposit was made into the registry of this court prior to the phase one trial. As a result, the schedule was not prepared in accordance with the requirement that each picker be assigned a minimum of nine hours per day. Accordingly, this schedule is not relevant. Moreover, the defendants

did not submit any other schedule which did apply the nine-hour minimum to only those workers purportedly affected by the office practices. They did, however, introduce a schedule which extends the three-year limitation to all original FLSA plaintiffs (Defs.Ex. 212).

Thus, I have been presented with two basic alternative schedules regarding the FLSA statute of limitations: one that may well be underinclusive because it fails to cover individuals in Period I who under the nine-hour minimum could show a willful violation due to office changes, and one that may well be overinclusive because it extends the three-year limitation to individuals in Period I (as well as others) who did not suffer a willful violation.[3] As indicated, when presented with alternative schedules that do not correspond with the prior findings and rulings, I will select the one that does not appear to understate unpaid wages. Under that principle, I will use the schedule that applies a three-year limitation to all periods, namely the schedule set out in Defendants' Exhibit 212.

B. In general, the limitation period is computed from December 22, 1994, even though the suit was not filed until March 2, 1995. This is because the parties had a tolling agreement while they discussed settlement (Plts.Ex. 732). An issue is presented, however, whether that agreement covers only the original consenting FLSA plaintiffs, or whether it extends to certain plaintiffs who executed the necessary consents to join the suit after the suit was filed.

The tolling agreement was entered into by Florida Rural Legal Services, Inc. ("FRLS") on behalf of "certain persons ... now represented by FRLS," and provided "[i]n consideration for FRLS agreeing, on behalf of the above clients," not to file a lawsuit for alleged FLSA and AWPA violations, the defendants agreed to waive any defense based upon the passage of time (Plts.Ex. 732). By its terms, this agreement would cover only those individuals who were represented by FRLS at the time of the agreement and would not extend to people who subsequently were represented by plaintiffs' counsel. Moreover, the plaintiffs have acknowledged that at a hearing their counsel conceded that late-consenting plaintiffs do not fall within the coverage of the tolling agreement (Doc. 324, p. 32).

Nevertheless, the plaintiffs assert that, because the tolling agreement covers the AWPA class, it should cover late-consenting FLSA plaintiffs as well. The problem with this argument is that its premise is wrong. The tolling agreement does not cover all AWPA class members as individual plaintiffs, but only those AWPA claimants who were represented by FRLS at the time of the agreement.[4]

---

3. The difference in the two schedules is only $2,183.63, which doubled as liquidated damages is $4,367.26 (Defs.Exs.203, 212). Furthermore, if the three-year limitation schedule were not used, the persons excluded from FLSA damages due to the shorter FLSA limitation period would still recover their unpaid wages with interest under the AWPA due to the four-year limitation provision. That recovery for the excluded persons for the time difference in the two schedules would be $3,171.29 (Defs. Ex. 204 less Defs. Ex. 213). Thus, the monetary significance of using the overinclusive schedule is just $1,195.97, even

disregarding additional accumulated interest that would reduce this amount (*see also* Defs. Exs. 212, plus 213, less Defs. Exs. 203 and 204).

4. The plaintiffs state that the defendants have not challenged the contention that the tolling agreement applies to the entire AWPA class so that the statute of limitation runs back four years from December 22, 1994 (Doc. 324, p. 33). Assuming that the contention was even asserted at some point before the plaintiffs' reply brief and that the defendants therefore had an opportunity to challenge it, there is no reason why they should bother to do so. The

The late-consenting plaintiffs' primary argument regarding the FLSA statute of limitation is that it should be equitably tolled. In this respect, these plaintiffs argue that they should have the benefit of an earlier filing date because, once the suit was filed, Local Rule 4.04(e), which deals with class actions, prevented the named plaintiffs and their counsel from recruiting potential plaintiffs. This contention is unpersuasive under the circumstances of this case.

■ It is recognized that time limits in federal statutes like the FLSA are generally subject to equitable tolling. *Irwin v. Department of Veterans Affairs*, 498 U.S. 89, 95, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990). Typically, however, equitable relief is extended "only sparingly." *Id.* at 96, 111 S.Ct. 453. Equitable tolling is applied when necessary to prevent an injustice. *Justice v. United States*, 6 F.3d 1474, 1475, 1479 (11th Cir.1993).

■ In this case, no injustice will occur if the late-consenting plaintiffs are barred from recovery under the FLSA. In that event, they will recover any unpaid wages, with interest, under the AWPA. Thus, while the late-consenting plaintiffs will not recover double their unpaid wages, they will receive fair and adequate compensation. The inability to recover the greater amount of double their unpaid wages does not strike me as an injustice that warrants equitable tolling.

Moreover, the plaintiffs have not demonstrated the type of circumstance that normally supports equitable tolling. *See Justice v. United States, supra,* 6 F.3d at 1479–80. The plaintiffs, rather, simply rely upon the local rule that prohibits plaintiffs and their lawyers from soliciting class members. This reason seems insufficient since the plaintiffs are expected to act with due diligence, regardless of whether they have been recruited. Further, it is hard to see that the local rule made any difference, since, as the defendants point out, the late-consenting plaintiffs filed their consents before the prohibition of the rule was lifted (Doc. 320, pp. 13–14).

For these reasons, equitable tolling will not be applied with respect to the late-consenting plaintiffs. As a result, the schedule set out in Defendants' Exhibit 212 remains the operative one for the FLSA claims.

C. The FLSA claims raise several additional issues.

1. One FLSA plaintiff, Ancelio Phanor, has died. As a result, he was dismissed as a named plaintiff at the beginning of phase two. The amount due him, $425.49 in unpaid wages, which doubled as liquidated damages is $850.98, should be excluded from the amount of FLSA damages shown on Defendants' Exhibit 212.

However, in their proposed findings of fact and conclusions of law, the defendants state that the unpaid wages of $425.49 should be given to Phanor's estate under the AWPA (Doc. 319, p. 20). It is appropriate to accept that concession.

The defendants say further that, since no interest has been specified for that amount, none should be awarded. But the record is replete with evidence about interest. Moreover, the parties should have no difficulty computing the proper interest at federal rates, as Mehta has regularly done with other AWPA class members. There-

four-year statute of limitation applicable to the AWPA would not exclude any work at issue in this lawsuit, regardless of whether the action was deemed commenced on December 22, 1994, or was considered commenced on March 9, 1995, the day it was filed. No contention has been raised by the defendants that the AWPA class members are not covered by at least the later of these dates.

fore, the estate of Ancelio Phanor is entitled to recover under the AWPA $425.49 with interest.

2. The FLSA plaintiffs, apparently anticipating an argument by the defendants, have asserted that they are entitled to liquidated damages under 29 U.S.C. 216(b) because the defendants have failed to establish good faith. *See* 29 U.S.C. 260. In fact, the defendants did not meaningfully attempt to show that the minimum wage violations were committed in good faith. Consequently, the FLSA plaintiffs are entitled to liquidated damages of an amount equal to their unpaid wages.

3. An individual named Trinidad Lopez filed a consent form as an FLSA plaintiff. The defendants' records, however, do not show that he ever worked for them, as the plaintiffs acknowledge (Doc. 324, p. 29). Barker, the plaintiffs' expert, confused Trinidad Lopez with Angel T. Lopez, and assigned Angel's unpaid wages to Trinidad. Therefore, Trinidad Lopez is not entitled to damages under the FLSA. Of course, Angel T. Lopez remains entitled to recovery under the AWPA.

4. The defendants have submitted schedules with respect to both the FLSA and AWPA claims in which they reduce the amount of damages as a result of incentive and bonus payments received by some FLSA plaintiffs and AWPA class members. The defendants, however, have failed to demonstrate that those deductions are warranted.

As found previously, the incentives included a $100.00 bonus for each picker who was on the payroll before a certain date, was not absent without an acceptable reason for more than three consecutive days, and stayed until the end of the season. In addition, for every box picked above a specified quantity, a bonus of ten cents would be paid, with five cents to be paid during the current pay period, and five

cents to be deferred and added to the signing bonus.

The contention that these incentives should be credited to the defendants when computing the amount of unpaid wages appears to be an afterthought, since the evidence on the issue is, at best, sparse and the legal authority is negligible. The only legal support for the contention is the defendants' reference to a regulation that addresses how bonuses are to be handled in determining overtime compensation (Doc. 325, p. 6). However, overtime compensation is not involved in this case and thus the defendants' supporting authority is beside the point.

Intuitively, it would seem that the season-ending payment (especially the $100.00 bonus) would not be included in determining whether the minimum wage was met for a particular workweek, but that the five-cent payment made during the current pay period might be considered. It is unnecessary to resolve the issue with respect to the five-cent payment because the defendants have not submitted any schedules which limit the proposed credit to this aspect of the incentive program.

For these reasons, the schedule that governs the FLSA damages continues to be Defendants' Exhibit 212. That schedule shows a total of unpaid wages in the amount of $10,904.96, which doubled as liquidated damages comes to $21,809.92. As indicated, this latter amount should be reduced by $850.98 as a result of the dismissal of Ancelio Phanor. Thus, the total FLSA damages are $20,958.94.

### III.

The primary relief sought in this case is predicated upon the AWPA. The Act pertinently provides (29 U.S.C. 1854(c)):

(1) If the court finds that the respondent has intentionally violated any provision of this chapter or any regulation

under this chapter, it may award damages up to and including an amount equal to the amount of actual damages, or statutory damages of up to $500 per plaintiff per violation, or other equitable relief, except that (A) multiple infractions of a single provision of this chapter or of regulations under this chapter shall constitute only one violation for purposes of determining the amount of statutory damages due a plaintiff; and (B) if such complaint is certified as a class action, the court shall award no more than the lesser of up to $500 per plaintiff per violation, or up to $500,000 or other equitable relief.

In short, the Act authorizes actual damages, statutory damages and equitable relief. The plaintiffs seek each of these types of relief, and each type presents substantial issues. Further, the § 1854(c)(1)(B) damage limitations are implicated because this case has been certified as a class action.

■ A. The plaintiffs seek actual damages based upon the finding that the defendants had committed an intentional violation of the AWPA by failing to comply with a posted "working arrangement" to pay at least the minimum wage of $4.25 for each hour worked in a workweek.[5] As the prior findings indicate, the evidence demonstrated to me that the office changes in Period I and the matching (with knowledge) in Period III were clearly intentional violations.

Because it was unnecessary for me to go further at that time to find a statutory violation, I was more equivocal concerning whether the mere failure to pay the minimum wages that were due amounted to an intentional violation (Doc. 262, p. 39). This

equivocation was based in part upon the lack of any decisions directly on point. Further, the word "intentional" is frequently used to require a greater showing of a mental state. But, as noted, the courts have concluded that, when Congress used the word in the AWPA, all it meant was that a party is responsible for the natural consequences of its acts (*id.*). Accordingly, the defendants' payment of wages without maintaining accurate records makes them responsible for any failure to pay the minimum wage; such a failure naturally follows from the defendants' actions. Moreover, it is highly unlikely that Congress intended a statutory scheme under which farmworkers could not recover unpaid wages, even if the failure to pay was due only to some mistake or lack of care.

Since the Findings of Fact and Conclusions of Law were issued, no party has sought a modification or clarification of the indication that the mere failure to pay wages was an intentional violation. Accordingly, I will now state with more firmness that each failure to pay the minimum wage was an intentional violation of the working arrangement that may be recovered under the AWPA.

It is appropriate to add that, even in the absence of such a finding, the plaintiffs would be awarded minimum wages for the entire period, since the defendants have not submitted schedules that would appropriately cover less than that. Thus, while the defendants have introduced a schedule that addresses only Period III (Defs.Ex. 228), they did not introduce a schedule that properly accounts for the clearly intentional violations in Period I. Like the

---

**5.** It is noted that in the earlier Conclusions of Law an issue was raised whether unpaid minimum wages should be restricted to the FLSA and not awarded under the AWPA (Doc. 262, p. 40). At hearings conducted between that time and the second phase of the trial, the plaintiffs persuaded me that it is appropriate to award unpaid wages as actual damages under the AWPA.

situation regarding the FLSA, the AWPA schedule reflecting the prior court deposits due to office changes in Period I (Defs.Ex. 231) was not prepared in accordance with the nine-hour per day minimum (Doc. 316, p. 59). Accordingly, it is irrelevant.

The defendants' basic AWPA schedule (Defs.Ex. 205) is therefore the only one that sufficiently covers the patently intentional violations resulting from the office changes in Period I.[6] Consequently, Defendants' Exhibit 205 would be the one used, even if other failures to pay minimum wages in Periods I and II were not deemed intentional. As indicated, however, all failures to pay the minimum wage have been found to be intentional under the law. Defendants' Exhibit 205, therefore, will be the primary schedule used for determining unpaid wages.[7] That schedule shows wages due of $481,453.31.

B. The question is then presented of what prejudgment interest, if any, is due on that amount. The defendants do not argue that no prejudgment interest should be awarded, but contend that it should be at the federal postjudgment statutory rate. *See* 28 U.S.C. 1961(a). The plaintiffs oppose the use of that rate, and propose several higher alternative rates. However, for the following reasons, the federal postjudgment rate will be applied.

█ The main reason for using the federal rate, which the plaintiffs claim is too low, is that the large unpaid-wages figure is most probably overstated. Thus, due to the defendants' failure to maintain accurate records, the plaintiffs were given the benefit of the doubt and the minimum workday was adjusted upward from eight to nine hours (Doc. 262, p. 24 ¶ 84). It would be unfair to compound this generous upward adjustment by requiring the defendants to pay interest on its product at a high rate. In other words, there is no justification for making the defendants pay a high rate of interest upon estimated unpaid wages, which, if the defendants had kept accurate records, may not be due at all. The use of the moderate federal statutory interest rate helps offset the probable overstatement of the principal.

Furthermore, I do not find persuasive under the circumstances of this case the plaintiffs' reasons for using a higher rate. It is baseless to think that the defendants, who must pay generously-estimated actual damages with interest, substantial statutory damages, and, probably, attorneys' fees, obtained a windfall in this case, and they certainly did not act with the expectation of receiving a windfall. Also, the individual amounts involved in this case are not the type that the AWPA class members would have invested. In addition, the plaintiffs' criticism of the federal statutory rate seems excessive, since Congress plainly had reasons for applying that rate to judgments, and seemingly the same reasons would be valid in prejudgment situations.

The plaintiffs' claim for a high interest rate also founders on the fact that all of their unpaid wage schedules have been rejected as incorrect. In line with the approach expressed earlier that giving the parties an additional opportunity to refine schedules was unwarranted at this point, I will continue to look solely to the defendants' schedules, and they only use the

---

6. Defendants' Exhibit 205 is similar to Exhibit 274 except that the latter exhibit decreases the amounts due as a result of the incentive payments. As previously explained (*supra*, p. 1302), the deduction of those payments was not adequately justified and supported. Accordingly, Exhibit 205, rather than Exhibit 274, is the correct schedule.

7. There are potential adjustments to this schedule. For the time being, it is appropriate to focus on the basic schedule to address the fundamental legal issues it raises.

federal statutory rate. In other words, there is no correct schedule before me that uses any other rate.[8]

The defendants' basic schedule of unpaid minimum wages computes prejudgment interest of $202,715.34 (Defs.Ex. 205). That seems ample to me.

The total of estimated unpaid wages and prejudgment interest as shown on Defendants' Exhibit 205 is $684,168.65. The interest is computed through January 31, 2000, and thus an additional amount will be due when judgment is finally entered after the issue of attorneys' fees is resolved.

C. The defendants argue that the amount of unpaid wages and interest must be reduced to $500,000.00, which, they say, is a statutory cap on all damages under § 1854(c) in class actions. The plaintiffs contend that the cap applies only to statutory damages, not actual damages.

■ The operative portion of § 1854(c), which was quoted above (*supra*, pp. 1302–03), is that, "if such complaint is certified as a class action, the court shall award no more than the lesser of up to $500 per plaintiff per violation, or up to $500,000 or other equitable relief." Since, as the plaintiffs point out, the limitation of "$500 per plaintiff" applied to statutory damages earlier in the provision, it follows that it would continue to apply to statutory damages at the end of that sentence. Accordingly, the limitation of the *"lesser"* of "$500 per person per violation" in statutory damages, or $500,000.00, must mean that the cap of $500,000.00 also applies to the statutory damages. Conversely, there is nothing in the language of § 1854(c) that indicates that the cap applies to actual damages.

Accepting that there may be some ambiguity in the language of § 1854(c), the plaintiffs point to legislative history demonstrating that Congress intended that class members would be able to recover all of their actual damages without a dollar limitation. Thus, the plaintiffs quote a House report stating (H.R.Rep. No. 97–885 (1982), reprinted in 1982 U.S.C.C.A.N. 4547):

> Where an intentional violation has been committed, the Act permits a farmworker to recover either an amount equal to his actual damages where there is no dollar limit, or statutory damages of up to $500.00 per plaintiff for each violation of a single provision with an upper limit of $500,000 for a class action. *Id.* at 4567

The plaintiffs also refer to comments made during the legislative discussion of the proposed act that, although carrying less weight, similarly indicate that there is no limit on the amount of actual damages (Doc. 322, p. 32).

In addition, the plaintiffs argue, with some force, that a cap on actual damages is contrary to common sense and that they are unaware of any statute that limits the recovery of "actual, mathematically measurable damages" (Doc. 322, p. 33). The defendants, in response, point to the Family Medical and Leave Act provision that limits recovery of direct monetary losses other than employment compensation to a period of twelve weeks, and to the Civil Rights Act's caps on certain compensatory damages. Neither statute disproves the plaintiffs' contention. Under both Acts, there is no apparent limitation on back pay. *See* 29 U.S.C. 2617(a)(1)(A)(i)(I); 42 U.S.C.1981a(b)(2), (3). Further, the limitation in the Family Medical and Leave Act to twelve weeks of actual damages of a non-employment-compensation nature is

---

**8.** For similar reasons, interest is appropriately compounded annually, and thus the defendants' approach in that respect is acceptable.

consistent with the extent of the leave authorized by that Act. In all events, the two statutes cited by the defendants fail to dispel the idea that it would have been highly unusual if Congress had capped actual damages in the AWPA.

The plaintiffs' unpaid wages with interest will therefore not be limited to $500,000.00. As indicated, the defendants' basic schedule shows that for the AWPA class members the amount of these damages is $684,168.65.

D. To the basic schedule, there are potential adjustments. First, there should be added amounts due under the AWPA to FLSA plaintiffs based upon work excluded by the three-year limitation period that has been applied to those individuals. Those unpaid wages with interest total $1,796.85 (Defs.Ex. 213).[9]

In addition, the defendants have listed separately amounts potentially due under the AWPA to "Farm Labor Contractors with Picking Records" (Defs.Ex. 206). The defendants contend that these individuals are not entitled to recovery of the calculated amounts because they are excluded from the definition of migrant and seasonal workers. The AWPA provides that a migrant or seasonal worker does not include "any immediate family member of an agricultural employer or a farm labor contractor." 29 U.S.C. 1802(8)(B), 10(B).

The defendants' apparent attempt to apply this provision to both farm labor contractors and to immediate family members of farm labor contractors illustrates that the provision presents something of a co-nundrum. Neither party has cited, and I have not found, any other provision that excludes farm labor contractors from the protections of the Act. However, it would be anomalous for farm labor contractors to be protected by the Act, but their immediate family members to be outside the Act's protection. Perhaps farm labor contractors are implicitly excluded from the protection of the Act, while their family members are explicitly excluded. That would be a strange or sloppy piece of legislative drafting.

The parties, particularly the defendants who raised the issue, have made no meaningful attempt to furnish a solution to this statutory puzzle, probably because the amounts involved are not sufficiently significant. The plaintiffs, nevertheless, have appropriately pointed out that the defendants cannot assert both interpretations and that the most natural reading (due to the absence of a comma) is that migrant and seasonal workers do not include immediate family members of farm labor contractors.

■ The plaintiffs argue that, in all events, the defendants have failed to show that the eleven individuals with estimated unpaid wages on Defendants' Exhibit 206 were picking citrus at the same time they were performing activities as a farm labor contractor. The plaintiffs point out that they demonstrated, through picking records, that the eleven individuals were picking citrus, but that all that the defendants have shown is that the individuals had farm labor contractor certificates. I agree that the defendants' showing is insufficient

9. The defendants assert on this point that the plaintiffs must first prove which FLSA workers are migrant or seasonal workers protected by the AWPA (Doc. 320, p. 26). This issue has already been resolved against the defendants in the Findings of Fact and Conclusions of Law (Doc. 262, p. 31 ¶ 2). It is too late to raise it now. For the same reason, the defendants' claim that Martin Villa is not covered by the AWPA because he was a year-around employee is defeated by its untimeliness, as well as by the plaintiffs' response that the essential factor is not that the worker was not employed on a seasonal basis, but that he was employed in agricultural work of a seasonal nature, primarily doing field work. 29 C.F.R. 500.20(r), (s).

to demonstrate that the individuals' picking took place at the same time they were actually performing as farm labor contractors. Moreover, in my view, this argument is untimely because it should have been factually developed and presented at the first phase; as indicated, it has previously been concluded that "each plaintiff was either a migrant or seasonal agricultural worker within the meaning of the AWPA" (Doc. 262, p. 31 ¶ 2).

Further, the defendants' references in their memorandum (Doc. 320, p. 15 n. 10) and their proposed findings of fact and conclusions of law (Doc. 319, p. 20) to earnings by crew leaders of ten cents per weight box for all picking is not supported by citation to evidence in the record. As the defendants note, no party has included these earnings in any calculations (Doc. 320, p. 15 n. 10). In light of the lack of evidence showing payments of these amounts at pertinent times and in light of their omission from all schedules, the assertions concerning these payments will be disregarded.

Consequently, the amounts calculated for the individuals listed on Defendants' Exhibit 206 will be added to the figure on Defendants' Exhibit 205. The unpaid wages with interest, as shown on Defendants' Exhibit 206, total $4,166.01.

The defendants also contend that two individuals should be excluded from the basic AWPA schedule (Defs.Ex. 205) because they are immediate family members of farm labor contractors, one being a brother and another a father. The plaintiffs respond first that the defendants have failed to show that farm labor contractor Alfonso Cardenas was the brother of citrus picker Indalecio Cardenas, as claimed (Doc. 320, p. 18). The plaintiffs are correct that the record at phase one shows that Alfonso Cardenas's brother's name was Ernesto and that there was no mention of Indalecio Cardenas at the page

cited by the defendants (Doc. 237, p. 61). Accordingly, the defendants have failed to show that Indalecio Cardenas should be excluded from Defendants' Exhibit 205 as a family member of a farm labor contractor.

■ With respect to the contention that Santiago Reyes, Sr., should be excluded from recovery because his son, Santiago Reyes, Jr., was a farm labor contractor, the plaintiffs argue that the defendants have failed to show that the father was engaged in citrus picking at the time his son was performing as a farm labor contractor. I agree that the defendants have not made such a showing and that, absent such a showing, Santiago Reyes, Sr., should not be precluded from recovering under the AWPA. Congress could not have intended to deny immediate family members of farm labor contractors the protection of the AWPA unless there was some working relationship at the relevant time between the farm labor contractor and his family member.

The actual damages under the AWPA should also include unpaid wages of Ancelio Phanor, who was dismissed as an FLSA plaintiff due to his death. The defendants pointed out, appropriately, that his unpaid wages of $425.49 should be paid to his estate. As previously indicated, prejudgment interest should be computed at the federal statutory rate.

In sum, the actual damages for the defendants' failure to comply with their working arrangement to pay the minimum wage amount to a total of $690,557.00 in unpaid wages and prejudgment interest. Additional prejudgment interest needs to be calculated and added to that amount. The additional interest for the individuals listed on Defendants' Exhibits 205 and 206 runs from February 1, 2000, until the date of judgment, while the interest on the amount due to Phanor's estate is to be computed in the same manner Mehta used

for those listed individuals up to the date of judgment.

## IV.

A. The plaintiffs also seek $1.5 million in statutory damages. In this respect, the plaintiffs acknowledge that, in light of the award of actual damages for the failure to comply with the working arrangement, they cannot recover statutory damages for that violation. They assert, however, that they should receive separate awards for each of the other three statutory violations, which are the failure to pay wages when due, the failure to maintain accurate records, and the failure to provide accurate weekly pay documents. The plaintiffs also contend that they should be awarded statutory damages for each statutory violation on a seasonal basis, thus tripling the statutory cap of $500.00 per person per violation. In a related argument, the plaintiffs contend that the $500,000.00 cap should also be applied on a seasonal basis, so that they can recover a maximum of $1.5 million for the three seasons involved in this case.

The defendants, in turn, argue that the plaintiffs should not be awarded any statutory damages. First, they contend that the $500,000.00 limitation applies to all damages, and the award of actual damages already reaches the cap. Further, they assert that the plaintiffs cannot recover both actual damages and statutory damages. They also argue that, in all events, an award of statutory damages is unwarranted.

Neither side's position is persuasive. For the most part, their legal theories lack merit.

■ As previously indicated (*supra,* p. 1305), the $500,000.00 cap in § 1854(c) does not apply to an award of actual damages and only limits an award of statutory damages. Consequently, the award of actual damages, even though it exceeds $500,000.00, does not preclude an award of statutory damages.

Moreover, because four intentional statutory violations were found, and the plaintiffs have received actual damages on only one of them, there is nothing in the statute that precludes an award of statutory damages for the other three. To the contrary, § 1854(c) provides for "actual damages, or statutory damages ... per plaintiff per violation."

■ However, the fact that statutory damages can be awarded for each of the three uncompensated statutory violations does not mean that they should be. In my view, it is most reasonable to group the four violations into two sets: two relating to insufficient pay, and two relating to inaccurate records. It is recognized, as the plaintiffs argue, that, with respect to the four violations, each statutory provision that was violated does not cover precisely the same subject matter as the others. Nevertheless, under the circumstances of this case, the two pay violations are based on essentially the same facts, and so are the two recordkeeping violations. On the other hand, contrary to the defendants' contention, the pay violations are distinct from the recordkeeping violations, although the pay violations may have arisen from the recordkeeping violations.

Accordingly, it seems to me that the failure to pay the minimum wages when due has been adequately compensated by the award of actual damages for the failure to comply with the working arrangement to pay the minimum wage. That award, however, does not sufficiently cover the recordkeeping violations. Therefore, the statutory damages predominantly, if not entirely, should cover those violations.[10]

---

**10.** As subsequently explained, the statutory damage figure that is found to be appropriate

Both sides cite *Beliz v. W.H. McLeod & Sons Packing Co.*, 765 F.2d 1317 (5th Cir.1985), which involved the AWPA's predecessor statute, as setting forth pertinent factors to be considered in determining an award of statutory damages. Neither side, however, seems to have listed all of the factors identified in *Beliz*, which are (1) the amount allowed to each plaintiff for each violation, (2) the total amount of the award, (3) the nature and persistence of the violations, (4) the extent of the defendants' culpability, (5) damage awards in similar cases, (6) the defendants' ability to prevent future violations of the Act, (7) the substantive or technical nature of the violations, (8) the circumstances of the case, (9) the total number of plaintiffs involved, (10) the total number of violations, and (11) the plaintiffs' recovery on closely related claims in the same suit that will in part compensate the damages caused by violations of the Act. 765 F.2d at 1332, 1333. While I have considered all of these factors, some of them are not particularly helpful and do not warrant discussion. The overall assessment of statutory damages is not aided by some compulsive exegesis on each factor.

The factors to which I give the greatest weight are the plaintiffs' recovery of unpaid minimum wages with interest or liquidated damages, and the absence of any malevolent scheme or intent on the part of the defendants' management. It is also of particular significance that, in view of the large number of plaintiffs, even a modest award for each plaintiff would amount to an additional six-figure recovery from the defendants.

Both sides have mentioned awards of statutory damages in cases of this type.

Those awards, however, range from $15.00 per plaintiff per violation to the maximum of $500.00 per plaintiff per violation. These references are not of much assistance since there has been no showing that any of the cited cases are closely similar to this one.

Both sides also refer to the provision in § 1854(c)(2) that authorizes a court in awarding damages "to consider whether an attempt was made to resolve the issues in dispute before the resort to litigation." About all I get out of the discussion on this issue is that the defendants did not try very hard to settle the case before suit was filed, and the plaintiffs made it difficult to reach a pre-suit settlement because they submitted vague information regarding the claims. In all events, this factor is not pertinent in deciding upon an award of statutory damages; two trials, mounds of evidence, and reams of argument on numerous issues convinces me that there was no reasonable possibility that this case could have been settled prior to suit being filed.

In assessing the foregoing factors, particularly the ones specifically identified, it seems to me that an award much in excess of $200,000.00 would be unreasonable. An award of actual damages against the defendants in an mount which will clearly exceed $700,000.00 has already been determined. And, as indicated, there is nothing about the defendants' conduct that justifies a heavy-handed punitive award.

On the other hand, in view of the large size of the class, any award above $30.00 per plaintiff would apparently exceed $100,000.00. In this respect, the plaintiffs state that there are 4,007 plaintiffs and that 3,400 of them are due unpaid wages

breaks down to $20.00 per plaintiff per season. I could, of course, subdivide that amount further to $7.50 for each of the two recordkeeping violations and $5.00 for the

failure to pay wages when due. I do not find that additional division to be helpful in determining an appropriate amount of statutory damages.

(Doc. 322, pp. 1, 22). The plaintiffs only argue for statutory damages on behalf of the 3,400 with unpaid wages. Conceivably, statutory damages for recordkeeping violations might have been available for the remaining class members if, for example, matching of hours to bins was demonstrated for a plaintiff in a workweek in which he or she had no unpaid wages because the person's pay at the piece rate exceeded the minimum wage. No such showing was made, and no argument was presented, in support of a claim by the plaintiffs who could not establish unpaid wages.[11] Thus, the number of plaintiffs receiving statutory damages is, by their count, 3,400, although under the defendants' schedules the number is probably less.

Based upon all the factors, it seemed to me that an award of statutory damages in the neighborhood of $50.00 per plaintiff was appropriate. Upon further reflection, I thought that the amount of statutory damages should be measured by the number of seasons worked. In other words, someone who had worked for the defendants for each of the three seasons should receive more than someone who worked for the defendants only in one season, perhaps for just a short period. Significantly, the plaintiffs advocated this approach (Doc. 322, p. 54).[12]

Therefore, I concluded that the maximum statutory damages per plaintiff should be $60.00, and should be determined by awarding each class member with unpaid wages $20.00 for each season he or she worked. This award could be as high as $204,000.00 if there were 3,400 class members who worked in all three seasons, and as low as $68,000.00 if all members only worked one season. The final amount is most likely in the middle of that range.

 The individuals to receive the statutory award are those listed on Defendants' Exhibit 205 as entitled to unpaid wages, and those FLSA plaintiffs who similarly have unpaid wages. The individuals set forth on Defendants' Exhibit 206 as farm labor contractors will not be awarded statutory damages. For the reasons previously stated, I have concluded that those individuals may recover actual damages. However, since the inaccurate records and thus the insufficient pay were primarily the result of deficient recording practices by the crew leaders, it seems unreasonable to me to award statutory damages to individuals who, at least at some point, likely contributed to the problem.

B. The parties also advert to issues concerning distribution of the damage award. The defendants in their proposed findings of fact and conclusions of law suggest a claim procedure that includes a ninety-day limitations period (Doc. 319, pp. 21–22). That matter was not addressed in the memoranda and therefore is not suffi-

---

**11.** It is somewhat ironic that the "lions" will apparently take nothing from this lawsuit. In reviewing the pickers' files following the first phase of the trial, I was greatly impressed by the awesome productivity of some individuals. They seemingly would always be paid under the piece rate because of their skill, whereas the others—the ones who will be compensated here—apparently put in less effort, or were less adept, or both. There just seems something troubling with that result.

**12.** It is appropriate to note that measuring the amount of statutory damages by the sea-

son does not indicate that I agree with the plaintiffs' contention that, for the purpose of applying the caps, each season is viewed as a separate transaction. In my view, the plain terms of § 1854(c)(1)(B) limit the amount of statutory damages in a class action—which this is—to the lesser of $500.00 per plaintiff per violation or $500,000.00, regardless of the number of harvest seasons involved. However, in light of the fact that the statutory damages awarded are less than the caps, the plaintiffs' argument concerning the interpretation of § 1854(c)(1)(B) is not presented.

ciently developed to permit a ruling at this time.

The plaintiffs proposed a procedure for distribution of unclaimed awards. This issue, as the defendants respond, appears premature. In any event, it needs more discussion. If the issue is presented in the future, the parties should consider the thought that the defendants would have a greater claim to retaining statutory damages than to retaining unpaid wages.[13] In the meantime, the plaintiffs should proceed with efforts to locate the plaintiffs as if none of the funds will be made available to Florida Rural Legal Services.

## V.

The plaintiffs also seek under the AWPA injunctive relief (1) requiring the defendants to comply with the AWPA, (2) compelling the defendants in their contracts with harvest contractors to provide that the contractors must comply with the AWPA, (3) mandating the use of time-keeping devices, (4) directing the recording of the entry and exit times from the groves of each crew bus or conveyance, and (5) requiring the submission to the Social Security Administration of appropriate additional payments and related documents for 1991 through 1994.[14] In my view, that relief is not warranted except for the item relating to Social Security.

■ An injunction, of course, is an "extraordinary remedy" and thus "a federal judge … is not mechanically obligated to grant an injunction for every violation of law." *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312, 313, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982). In order for injunctive

relief to be warranted, there must be a showing of a "real or immediate threat that the plaintiff will be wronged again." *Los Angeles v. Lyons*, 461 U.S. 95, 111, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983).

■ In this case, the culpability of the defendants' management was not substantial. As detailed in both this and the prior Order, there was no probative evidence that the management affirmatively advocated any scheme to cheat the pickers. In light of that circumstance, there is not a meaningful likelihood of a future violation sufficient to justify injunctive relief.

At the second phase of the trial, the plaintiffs adduced two additional items of evidence in support of the request for an injunction. Specifically, the plaintiffs presented testimony from a picker named Alejandro Benitez who, in May 1998, was underpaid for work in defendants' groves, and a 1997 citation issued to Eagle Lake based on record inaccuracies by outside farm labor contractors.

Benitez testified that, during the five-day period beginning May 5, 1998, he went to work for the defendants and kept track in a notebook of the time he worked. He stated that he worked approximately 52 hours but was only credited for 37 hours.[15]

The defendants assert that this testimony is suspicious in that Benitez left another employer where he had been paid more, came to work in a grove which he was told was bad picking, purportedly wrote down his time, and then after five days returned to his prior employer. The defendants also question the timing of this episode,

---

**13.** Also, thought might be given to whether those AWPA class members with no unpaid wages, presumably the "lions," could receive some portion of unclaimed funds.

**14.** The plaintiffs acknowledge that injunctive relief under the FLSA is available only to the Secretary of Labor (Doc. 322, p. 56 n. 25).

**15.** His notebook, when the half-hour lunch break is deducted, reflects working time of about 46 hours, 40 minutes (Plt.Ex. 843).

which was two weeks before the trial commenced.

While I agree with the defendants that the evidence from Benitez was suspect, even if it is taken at face value, it does not justify injunctive relief. From all that appears it was simply an isolated incident. This view is supported, moreover, by the absence of any other evidence showing specific underreporting of hours by the defendants in the several seasons that have passed since 1994.

The only other evidence of alleged violations since 1994 was a citation issued to Eagle Lake in February 1997 for failure to make or keep employer records and the failure to provide wage statements to workers (Plts.Ex. 842). These citations were based upon the activities of no more than three outside crew leaders (*id.*). Significantly, the Department of Labor decided not to assess any penalty against Eagle Lake, thus indicating that the violations were viewed as minor. Again, the fact that the plaintiffs could show no more than these minor violations involving, at most, three outside crew leaders in the several seasons since 1994 undercuts their request for an injunction.

The circumstances, therefore, do not support the issuance of an injunction even if the defendants had continued their business operations in the same form as 1994. In fact, however, the defendants' businesses have changed. Eagle Lake is no longer functioning. Further, Jack M. Berry, Inc., as owner of the groves, entered into a contract on June 23, 1998, with Jackson Citrus, Inc., a harvester, under which the defendant hired Jackson Citrus to harvest its groves. Consequently, neither defendant now directly employs any pickers. A Berry official testified that he does not expect this arrangement to change within the next ten years (Doc. 315, pp. 206–07).

The plaintiffs seek to ameliorate the effect of this change by arguing that, under the law, Berry is a joint employer. It seems inappropriate to attempt to determine on a somewhat truncated presentation the ancillary matter of Berry's joint-employer status, since that matter could conceivably become a central issue in other litigation. Assuming, *arguendo*, that Berry is a joint employer of Jackson Citrus's work force, that does not meaningfully increase the likelihood of a future AWPA violation. Notably, even though the plaintiffs called the president of Jackson Citrus as a witness, there was no evidence either of any violations of the AWPA or FLSA by Jackson Citrus, or that it was otherwise deficient in its compliance with those laws. Moreover, as of early 1997, the defendants hired a compliance officer, who now monitors Jackson Citrus's payroll records for compliance with the AWPA.

Certainly, in light of the defendants' changed business circumstances, injunctive relief to prevent future violations of the AWPA is not warranted. The evidence fails to show a sufficient likelihood of such violations.

Furthermore, with one exception, the particular requests for injunctive relief have not been substantiated. The plaintiffs ask first for an injunction directing the defendants to comply with the AWPA (Doc. 322, p. 63). However, such an injunction would merely require the defendants to obey the law, and would thus fail to provide the specificity demanded by Rule 65(d), F.R.Civ.P. *Burton v. City of Belle Glade*, 178 F.3d 1175, 1200–01 (11th Cir.1999).

The plaintiffs' second request is for a statement in contracts with harvesters directing them to comply with the AWPA. This arguably has the same flaw as the prior request. In any event, there is such a provision in the Jackson Citrus contract

(Defs.Ex. 258). Thus, relief in this form seems unnecessary.

Next, the plaintiffs want the defendants to be required to use automated time-keeping devices, such as time clocks, to record the time pickers enter and leave the groves. There was no evidence at either phase of the trial about the use of such devices. In the absence of some showing that the use of a time-keeping device is feasible, I am unwilling to force this practice upon the defendants. Moreover, as the defendants point out, simply recording the beginning and ending of the workday is insufficient to establish the compensable time worked during the day; the recorded time, in fact, may be misleading.

The plaintiffs similarly request injunctive relief requiring the defendants to record and retain the entry and exit times from the groves of the crews' vehicles. These times do not necessarily establish a picker's workday and it seems unwarranted to order the defendants to record times that may be irrelevant. Of course, the farm labor contractors are already under a legal obligation to record the hours worked.

Finally, the plaintiffs request an injunction directing the defendants to submit to the Social Security Administration corrected documents showing amounts earned by the plaintiffs during 1991 through 1994, and to pay any additional contributions that may be due, as well as any penalties and interest. Relief similar to this was ordered in *Saintida v. Tyre*, 783 F.Supp. 1368, 1376 (S.D.Fla.1992). Moreover, the defendants have not provided any specific reason why this requested relief should be denied. In light of the absence of cogent opposition, an Order will be entered granting the request regarding Social Security.

### VI.

In accordance with Rule 52(a), F.R.Civ. P., the foregoing shall constitute further findings of fact and conclusions of law in this case.

IT IS SO ORDERED.